Good morning, Your Honors. May it please the Court, I'm Joseph Daly on behalf of the Plaintiff Appellant Pension Funds. I'm going to reserve five minutes for rebuttal. Okay. Try to keep your eye on the clock. Yes, I will. Thank you. While this summary judgment appeal presents numerous issues for this Court's de novo review, this morning I would like to focus on two key areas, and that is the April 30, 2008 falsehoods by Scott Henry regarding ample credit market access, advanced conversations with supposedly enthusiastic lenders, and Sheldon Adelson's July 30 claims of unchanged fundamentals at LVS with purportedly aggressive development pipeline and extensive flexibility of LVS's funding options. Putting aside even the rest of the case, then the class period, if this Court agrees with us this morning, would start at least in April 2008. Now, the District Court correctly found that Scott Henry's statements on April 30 were misleading. And here are just some of the facts supporting that. Adelson privately admitted on April 6 to Edmund Ho, the chief executive of the Macau region, that LVS Macau was, quote, on the edge of failing. He admitted a week later in a second letter to Mr. Ho that the, quote, availability of the money in the credit markets has dried up. Goldman Sachs, one of LVS's three key advisors, noted in February that the international banks were hitting their risk limits and that they had shared that fact, quote, very directly with Mr. Henry, and also that the Asian bond markets were not going to be deep enough to contribute to LVS's funding gap. And one more thing, Goldman in April of 2008 highlighted LVS's dramatically declining EBITDA, or earnings, over the next three years, including 2008. As compared to the numbers that they had given the banks that made the previous Macau loan, LVS was suddenly looking at dropped earnings of 36 percent in 2008, 40 percent in 2009, and 41 percent in 2010, and that LVS needed to come up with its own money, needed to come up with a $2 billion parent raise, and that LVS was looking at loan covenant breaches of its United States credit facility over the next four consecutive quarters. And we've explained in our brief what that would mean. It would be cross default. Counsel, it struck me in reading the district court's summary judgment order that the court had difficulty with causation because of the fact that, for example, with regard to these April 30th statements, that several months later, there's a long period between the time that the statements are made and then the worldwide real estate market crashes. And the court basically said, I just don't see sufficient causation there between the statements and what ultimately happened around the globe. Yes, Judge Hellman. And we've argued that the court erred with that line of reasoning. Several points. Number one, you can't blame what happened to LVS on the global credit crisis happening in September 2008. In fact, our expert, Professor Feinstein, had pointed out that as late as August of 2007, the global credit crisis was already in full swing. The second point that the district court erred on, in addition to attributing it to the global credit crisis, was pointing to, for evidence of lost causation, some rumors in the market in June and July of 2008. Well, that may be fine. That may be fine that there had been rumors in the market, but then the district court said, but your expert, Professor Feinstein, didn't address those rumors. He only jumped immediately to August 20 and August 22 of 2008. That is not true. Professor Feinstein specifically addressed those rumors, and that is in the record at Excerpt of Record 195. He specifically addressed those rumors, talked about them in the context of lost causation, but said, for my purposes, for a conservative damages model, I am not including any of those drops in the damages model. He correctly then went to August 20, August 22, and November 6. This Court has said many times that the key question in lost causation is, have the Are you relying heavily on the Bank of America report with regard to causation? I don't know if we rely upon it heavily. I think the two- or three-page report, it's a very dramatic report. B of A analysts, I mean, these are experts in the field. They said that Las Vegas Sands, and I'm quoting here, has larger funding needs than many investors realized, end quote. And at that point, LVS stock drops while its peers are going up 7%. But there isn't any mention in that report of the EBIT, DAR, or Widener's April. We've actually discussed this in our reply brief at length. Part of B of A's sell recommendation and part of its very pessimistic view of Las Vegas Sands at that point, if you look at that report, you will see that they have plotted out what LVS is going to be doing, is going to be making for earnings in 2008 going forward. Those earnings, I believe, I want to say were only $0.28 a share for that year in that report. You go back to B of A's prior report just a month or two earlier, or two months earlier, pardon me, and the earnings were $0.56. So these market experts had actually seen what was going on at LVS and dropped those earnings. Seen what was going on at LVS or factored in where the worldwide real estate market was headed? That may be so, but let's not forget, loss causation doesn't require that our defendants' misstatements be the sole cause of what happens to the stock. It has to be proximate cause, though, does it not? It does. It does. I'm still trying to see the linkage based on the background of where the world was going at the time. Well, as always, context matters. Yep. And Las Vegas Sands had been beating the drum, had been looking at things through rose-colored glasses. They had been reassuring the market again and again, both on those April 30th statements, but then again Sheldon Adelson on July 30th had been reassuring analysts everything is fine. We have flexible funding options. We are in advanced, reasonably advanced conversations with lenders. This is also in the context, though. Didn't they get? I thought they got a new credit facility in August. They got a credit for 2008. They ended up being offered a $4.9 billion credit facility, but the problem was Goldman Sachs had told them earlier in that year you need $10 billion or $11 billion, which, by the way, and I'm paraphrasing, so I'm not quoting here, which in order to get, you're going to have to come in with $2 billion of your own equity. You are going to have to go to these lenders and give them accurate models. You're going to have to open the books and show them what's actually going on over in Macau. And we know, and it's in the record, that that was not happening. LVS was refusing to share its models with these new lenders until late July. Well, I guess the problem I'm having with the theory of your case, and maybe this is just too simplistic a view of it from my part, but the company continues obtaining credit throughout the period. Ultimately, I guess the family, the Edelman family, has to put in some of their own money in order to make it work. But ultimately, all these projects get finished, and as far as I know, they're up and running to this day. So I'm wondering, why did the district court err in its causation analysis? All right. Well, three points in response, and I want to address these in order. I disagree respectfully with Your Honor's representation that they continued to get credit throughout the period. They did not. In fact, they had to tap into that United States credit facility, the $5 billion bundle of monies that were there. That had already been reduced. So they weren't getting that. What they were doing was they tapped into that to fund what was going on in Macau. But by doing that, they put themselves in breach of the loan leverage ratio that was an important part of that. But isn't that one of the reasons why the family contributed money? Well, Your Honor makes it sound very benevolent. The Adelson family came in. Well, I'm not attributing any benevolence. All right. I mean, these are reasonable capitalists who, right, are trying to make a profit. As far as I know, that's not a crime. And that reasonable capitalist was willing to let LVS go down the tubes until the very last minute. But he didn't. I mean, that's the problem I'm having with your theory of the case here. I mean, I agree if you look at what was happening in 2008 in the world real estate market, these were tough conditions for every casino company along with the rest of the world. I mean, we're still hearing appeals in the housing market from what happened in 2008. Sure. So that's why I'm wondering why did the district court err in saying, I just don't see sufficient proof of proximate cause from those statements back in April? Well, the Adelson family, let's not forget, Sheldon Adelson was unwilling from 2007 right up until the very month or week that he did put in the money. He put in just enough money to save LVS from going into default on those loans on that particular day. And as the briefing discusses, it wasn't just to save LVS. He did it. It was a sweetheart deal through convertible debt so that if the stock dropped, which is unusual when you're doing a convertible debt purchase, he would still be protected, and he was. But, again, the record is clear that throughout that time, Mr. Adelson, Mr. Henry, Mr. Widener was telling the market, we're not having these funding problems. Adelson himself had said on July 30th to the assembled analysts, don't pay attention to those rumors, the rumors that the district court focused on. Don't pay attention to those rumors. We have flexible lending capability in place, and that just wasn't true. I know the defendants will likely get up here and say, well, we were in talks with lenders throughout this. I'm going to show you an e-mail where we're going to a certain Chinese bank, and they say we may give you $800 million. But what they won't discuss is some of those pieces of evidence I already talked to you about earlier, that the lenders were demanding updated, accurate models, and that's in their excerpt of record at page 277 through 279. They had not gotten those updated models until July. Goldman Sachs knew that LVS and Adelson were going to go out and do a little dog and pony show for the bankers in the middle of the summer, and privately they e-mailed to themselves, we don't know why they're doing this. There's no term sheets ready yet. In other words, it's a term of art, no pun intended, but you need to come to the bankers with specific figures, how much debt you have, how much you want, the repayment figures. They were unwilling to do that. Let's also not forget, by April 2008, inside LVS, their projected costs were going up. They were telling the market, we're going to approach these lenders, we're going to ask them for $10 billion to $11 billion. Inside, they were projecting, we're going to need $16 billion by the end of the year. And I know I said I had three points before. Do we know how much it ultimately cost? Is that in the record? I don't know, but that also dovetails with what I forgot to mention, my third point. I don't think it's correct to say that all the sites eventually got built out as they were planned. I'm unaware that that's in the record, that each one of the eight sites, particularly seven and eight, were finished and completed. Maybe one of the three was. I'm just not sure. Okay. So let's move on to Mr. Adelson, July 30th. You really cannot reconcile his statements about unchanged fundamentals and the fact that he was very implying that, don't worry, guys. I've got my billions in my back pocket of my wallet. I'm not going to let anything happen. We would submit that many of the same things that made Scott Henry's statements back on April 30th false and misleading and made with Sienter, which, by the way, the district court agreed with, we submit that those same factors are what made Mr. Adelson's July 30th statements. Counsel, why wouldn't those statements have been forward-looking? When you say, like, Mr. Adelson's statements? Yes, the July 30th statements. He says we have an aggressive pipeline. That's a present statement. That's a present tense statement. He is telling investors we've got this pipeline of seven or eight Macau projects, and our pipeline is still going forward aggressively. It's at the end. We know it wasn't going forward aggressively. They had pulled design staff off of Sites 7 and 8. Those sites were not getting designed, as Scott Henry later testified in his deposition. I'm sorry. It may have been Brad Stone. I'm not sure. But one of the two men testified that Sites 3, 7, and 8, they were too expensive. And in July, they recommended dumping those sites. And when Goldman Sachs said that to Scott Henry, Scott Henry wrote back and he said, well, that's not encouraging. And the amount of money that you're saying you can go out and get for us, that's too small. I mean, this is in July of 2008. But didn't construction activities continue? They all — yes, they did, Your Honor. They did. I mean, to the tune of $100 million that summer? And, you know, this Court has a long-storied history of recognizing that even literally true statements can still be misleading. And that's a perfect example of a true statement that's still misleading. Yes. But if the statement was that we are aggressively proceeding and they're still continuing their construction activities and spending more money, why isn't that a forward-looking statement? Well, Your Honor just said it. We are aggressively proceeding. I think that tells a reasonable investor we are aggressively proceeding on these sites, including 3, 7, and 8, when we know for a fact that Adelson had just said to Scott Henry privately in an email on July 11th, you know what, it looks like we're going to get the approvals for sites 7 and 8 from Edmund. But I thought he also made statements about we're looking at redesigns and that sort of thing, which I assume means we're trying to figure out how to ameliorate some of these cost increases. And the redesigns, as he later testified in his deposition, would have taken 3 to 4 months. Couple that with the fact that they had already pulled off the redesign teams off of those sites. They were no longer designing anything. You can't design something credibly when you don't have the funds to make sure that you have the funds there to do the design. I'm getting into my time. I'd like to sit down for a few minutes. Okay. Good morning, Your Honor. May it please the Court, Walter Carlson on behalf of Las Vegas Sands Corporation and Sheldon Adelson. I will be spending 15 minutes, and Mr. Sullivan on behalf of the codefendant, Mr. Widener, will use the last five minutes. Okay. This Court should affirm Judge Gordon's grant of summary judgment in this case. The record in the case is extensive. Judge Gordon carefully examined each statement that was challenged, and on one or more grounds held that the defendants were entitled to judgment regarding each statement. This Court should do the same. As the discussion with Mr. Daley suggested, as the Court reviews these statements, it's important to keep in mind the big picture as to what the case is about. Prior to and during the class period, Las Vegas Sands was embarked on an ambitious and unprecedented plan to construct a massive new development on Macau, on Cotai specifically. That plan involved numerous risks, including that it was not fully funded and would require additional funds, and that it was highly dependent on government regulations and permits which had not been received. These risks were fully disclosed before and throughout the class period, and as the class period progressed, Las Vegas Sands accomplished a great deal on Macau, but as conditions changed, it disclosed those changes. As Judge Tallman commented, near the end of this class period, the total and unexpected freezing of the global credit markets forced Las Vegas Sands to adjust its plans, and that's when the Adelson family invested a billion dollars of new money to prevent the breaches of the covenants. Mr. Daley said the credit crisis had started in August of 2007, and that's true in the United States with respect to the subprime loans, but economic circumstances in this country and economic circumstances globally changed dramatically in September of 2008, just two months before the presidential election that year, when Lehman Sachs went bankrupt, AIG became a federal agency, Merrill Lynch was taken over by Bank of America. The credit markets across the globe shot in what Las Vegas Sands had planned on for the purpose of financing those properties was unavailable. So the task of this Court is to review each challenge statement, and I heard Mr. Daley essentially abandon his claims of falsity and whatever with respect to statements prior to April 30th. Let me focus on the statements from April 30th, 2008, and then the statements in July. Plaintiffs argue that Judge Gordon erred in granting summary judgment on two grounds, and there are two grounds even though he did say that Mr. Henry's statements, a regional jury, might find them to be false and misleading. We respectfully disagree with that. But what Judge Gordon did do was to find those statements inactionable on both causation and safe harbor grounds. Let me deal first with causation, and this is essential so that the securities laws in this country don't become essentially a guarantee that if you invest and the stock goes down for some reason that's totally unrelated to the alleged fraud that you're protected. In Dura Pharmaceuticals v. Brutto, the Supreme Court said it is the plaintiff's burden of proving that the defendant's misrepresentation caused the loss for which the plaintiff seeks to recover. The Supreme Court then went and amplified this point in very important language. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect not the earlier misrepresentation, but changed economic circumstances. Counsel, this is a summary judgment order. How can we sort that out on summary judgment between what was caused by market forces and what may have been caused by the alleged misrepresentation? So I think we do have evidence here that supports the conference of summary judgment, Your Honor. And that's the analysis of loss causation that Judge Tallman was alluding to. On loss causation, Judge Gordon looked at the statement that he found potentially actionable and then looked at the corrective disclosures that the plaintiff's professor had put in. And it's important for this Court to note that that professor was never recognized as an expert in this case. We had filed a Daubert motion to exclude his testimony, and that motion was never ruled upon because the absence of loss causation is so manifest when you look at the corrective disclosures against the three items that the judge found potentially were false and misleading.  Between the time of Mr. Henry's statement on April 30th, 2008, and the time of the first corrective disclosure in August 20th, 2008, the situation as expressed to the market had changed dramatically. As of April of 2008, Mr. Henry was optimistic they would be able to get a $7 billion Macau loan to fund the completion of all of the properties. Between April 30th and the end of July, they were not able to get permits to develop or build 3, 7, and 8. So in the face of that, they adjusted, and they pulled back, and they said to the public on July 30th, 2008, that we are going to seek a $5.25 billion credit facility for Macau. And the $5.25 billion credit facility for Macau had been recommended by Goldman Sachs. It was launched to the marketplace on August 20th, 2008, and it was blown up by the credit crisis that occurred in September of 2008. So the point being, Mr. Henry's comments about being optimistic about a loan facility in April, which are totally no longer operative when it comes to August and they're pursuing a $5.25 billion, it's just not logical. It can't be loss causation. And when you look at the contents. It almost seems you're arguing that the 2008 collapse bailed your clients out from any causation. So I do believe that the deteriorating economy and the freezing of the credit markets didn't bail them out. It caused the problem, which prevented them from getting the financing. It was the intervening force, as the Supreme Court said in Dura v. Brutto, which is the change circumstance, which sort of means the misrepresentation that they pointed to previously is not the cause. So it's not a bailout. It just means it severs the proximate cause requirement. Now, I want to go through a couple of the specific arguments that the plaintiffs have identified here with respect to loss causation dates. So they first say that the first corrective disclosure is an article that appears on August the 20th of 2008. And when you look at that article, that article inaccurately says that the company is seeking less than $5.25 billion. That's clearly not the case. If you look at the record and you look at Supplemental Excerpt of Record 1421, 1423, which is verified at 2146, you'll see that they were pursuing the $5.25 billion. And the article that came out that day was criticized by other analysts that very day for being false and misleading. That's at Supplemental Excerpt of Record 1431. An erroneous article cannot be a corrective disclosure. To the Bank of America report, which the plaintiffs mentioned in argument and they brought out in their brief, the Bank of America report, which comes out on August 22nd, was based entirely on an analyst's personal evaluation of Las Vegas sands based on information that had been public for weeks. The case law is clear that an analyst's report who takes a negative view on a company is not providing a corrective disclosure. And for that proposition, I would cite to you both the Meyer v. Green case from the 11th Circuit, 710 F. 3rd at 1194, excuse me, 1199, and the In re Omnicom securities litigation at 597 F. 3rd at 512, the 2nd Circuit 2010. And then we heard Mr. Daly say, and they say this in their brief, that in fact, Professor Feinstein found corrective disclosures in early July. And with all due respect to Mr. Daly, if you read the Feinstein report, he does not put the corrective disclosures in early July that he now is pointing to, to the same scientific test with respect to the stripping out of confounding factors. It is not in the section of his report in which he purported to identify loss causation. And he didn't raise this before the Court below, so there were nine corrective disclosure dates. There wasn't a corrective disclosure date argued with respect to early July. Back to loss causation, just as a final concept. This Court has previously affirmed summary judgment on loss causation. It's done so on at least two equations, the In re Oracle Corporation securities litigation, 627 F. 3rd at 376, and Nuveen v. City of Alameda, 730 F. 3rd, 1111, 2013. The same principles are applicable here. Now, I don't have a great deal of time, but I did want to touch on Safe Harbor. And Judge Gordon found that the Safe Harbor protected Mr. Henry's statements on April 30, 2008. And at the time Judge Gordon wrote that decision, he did not have the benefit of this Court's subsequent decision in the In Re Quality Systems, Inc. matter. That presents a somewhat different framework than the intuitive surgical case which preceded it. But Judge Gordon faithfully applied the intuitive surgical case. And if you look at this as we argue in our briefs, what Judge Gordon did find would have the statements continue to be protected under the quality systems analysis. And the plaintiffs suggested in their brief that somehow we waived this point or Judge Gordon got it wrong because he changed from having said that's possible and didn't dismiss it at the motion to dismiss stage, but he granted summary judgment for us. And I'd say it's very acceptable for a district court to deny a motion to dismiss and then on a full evidentiary record determine that, in fact, there's no merit. And for that, I'd cite the Lorman case, 565 F. 3rd, at 248 Note 11. Now, let me come to Mr. Adelson's statements on July 30, 2008. As to each of those statements, Judge Gordon reviewed the evidentiary record with meticulous care, including the detailed evidence showing that banks were prepared at that time to proceed with a $5.25 billion loan from Macau and were working with Las Vegas Sands to put in additional funding at the parent level. There's no evidence to support plaintiffs' claims that these were false before Judge Gordon, and there's none now. The only argument that they come up with is that because two analysts said that maybe Mr. Adelson's comments had been broader than what he said, that that creates an issue of fact. There's no case law supporting that. His comments were given in response to a specific question with respect to the U.S. loan covenants. The contemporaneous evidence shows Mr. Adelson's intent. The fact that 16 other analysts had no similar confusion is highly probative. And there was no entanglement by the company with endorsement of the erroneous verbiage in those two reports. And for that, I'd cite the Syntex case, 95 F. 3rd, 922 at 934. And Judge Morris, your point, yes, when he's talking about we will have flexibility. We will be able to get this. That is forward-looking. It is fairly protected by the State Harbor. Now, I will rely on our briefs for the statements with respect to progress on Macau, but in response to your comments or your questions, Judge Tallman, the Cotai Strip was built. All of those sites were constructed with the exception of Sites 7 and 8, and Las Vegas Sands never got the permits to build on 7 and 8. Those pieces of property were taken back by the government, so they remain unbuilt. Let me just deal with loss causation as it replies to the two other statements that Judge Gordon said potentially could state a jury claim. And as I say, we respectfully disagree that there was evidence to support that this could be false and misleading, but you don't need to get there because as to the costs for Marina Bay Sands, after the November 1st, 2007 earnings call, on two different occasions, Las Vegas Sands told the investing public the amounts that it was expecting to spend would be greater. And as of July 30 of 2008, it had said, we expect those costs to be in excess of $4.5 billion. When you look at all of the corrective disclosures that the plaintiffs point to, not one talks about Singapore costs being in excess of $4.5 billion. I see I've hit my five minutes, and I'm sure that Mr. Sullivan will address the loss causation as it relates to the statement by Mr. Widener. Thank you very much. Thank you. Good morning. William Sullivan on behalf of William P. Widener, and may it please the Court. What I'd like to do is pick up on loss causation because I think loss causation is dispositive of many of the key issues in the case. And when you look at what Judge Gordon did, he found that there was no corrective disclosure. There were things in the market, the August 20th and August 22nd reports, but there was nothing in them that was corrective. And I know the EBIDAR term has been referenced earlier, and just to give that some context on the loss causation issue, the comments were made in connection with statements made by Mr. Widener early in the year, April. After the time of the comments, there were an April 30th and a July 30th statement about the actual income and performance of the company. That was out there in the marketplace, so there was nothing corrective. The document that they point to for that, which is the August 22nd Bank of America document, is not corrective on this point. In fact, if you look at it, the record at 185, it's a classic banking document, lots of text. In the lower left corner, there is a little chart, a little corner chart that talks about EBIDAR. And like so many of these things, they're simple. There's arrows that go up, down, or sideways. If you look at it, the EBIDAR report at that point is going upward, and it's reporting an increase. Not a great one, but an increase. So on its face, it's not corrective that the volume is falling apart on EBIDAR. So I think that was crystal, crystal clear in this. Overall, and overarching on the issue of loss causation, is that things weren't corrective. Mr. Carlson just laid out the Marina Bay Sands issue. Again, not a corrective statement to be found in that August 20th or August 22nd reports, one by the South Coast, South China Morning Post, and then the other one by the Bank of America. The Bank of America report was talking about financing. That was what was going on at Las Vegas Sands. The July 30th press conference and report was a watershed moment for the company, where they said to their shareholders and to the marketplace, we're changing. We're going to have to put a couple things aside. Markets are tough. We're going to have to scale back what we're going to ask the markets for, and we did that. And three weeks later, the Bank of America report gets done, and he's talking about financing. He's talking about an increased EBIDAR. He's not saying anything other than what the company has said about costs on the Marina Bay Sands project. Again, $4.5 billion are in excess of that. So when you look at these issues and you take them the way that Judge Gordon did and the way that you're supposed to for loss causation, which is take a look at what it says, what the company says, what's in the marketplace, you see that there was nothing corrective in these. The other one that I wanted to point out, there was a reference made by counsel about, well, there was some discussion earlier on in June-July about some of these reports that may have been helpful, but our expert just didn't pay attention to them, really focused on these later ones. The point that I think is most important is that they weren't focused on as corrective disclosures. They didn't have any impact on loss. So basically, there's no damage. So what's the point? Why do we care about it? And that's probably why they weren't identified as corrective. So the idea that you can somehow back into this by saying, well, we had something going on a little earlier, pointless. There's no damage. There's nothing associated with it. So I think, overall, that's the issue. My last few moments, I'd like to talk about Section 20A, which is an issue that we raised with respect to Mr. Widener. And if, of course, if there's no primary liability, it's done. It doesn't matter. If we get past that, I think that the allegations made by the plaintiff in this case, and the admissions made by them, show, identify a circumstance where Mr. Widener could not have been the controlling party. They allege that Mr. Anderson and others were in charge, absolute control, a dominant position, and that nothing could be attributed to Mr. Widener in that case. I realize that you don't have to get there if you rule with us on the primary issue, but I did want to raise that as an issue that we've briefed and I think we've laid out very clearly. Without any questions, I'm prepared to submit. Thank you. Thank you so much. Mr. Daly, you've saved a little time. Thank you, Your Honor. Two major points. I'm going to talk about the global credit crisis and then the loss causation issue. Regarding the global credit crisis, it's convenient, but it's not what drove their loss. It's in the record. The consensus was that the credit markets had already begun freezing up in August 2007. In December of 2007, Advisor Lehman Brothers noted that there was a $225 billion backlog in June of 2007 with credit, quote, virtually shut down in August, end quote, 2007. But we still have additional credit being obtained by the company after 2007, do we not? We have them dipping into the existing investment basket that was part of the larger $5 billion United States credit facility. So it's a tired cliché, but they're pretty much robbing Peter to pay Paul. They were dipping into that basket knowing that ---- But then another billion-dollar equity investment by the Adelson family. At the end. Right. But that doesn't account for what was going on within 2008, and that is the snapshot that this case focuses on. But I guess maybe I'm hung up on the point, but how can you evaluate causation without looking at what was happening in the context of the global credit market? And if I've made it sound as though I'm saying we should ignore it, I apologize. I don't ---- I am not saying that. But what I am saying, it's very clear, stemming back to the Dura case from the Supreme Court, that what has to be done at trial is to separate the various causes. But ---- Maybe the problem I'm having is I just don't see how you could separate that out from the evaluation of loss causation. Well, our expert looked at what was going on, the global credit crisis. He talked about, let's just say there's a 40 percent drop for LVS on a specific day. He X'd out what was happening with LVS's peers. He X'd out with other company-specific information coming out and gave a residual drop. So our expert did exactly that. He accounted for other factors that were affecting the stock. Moving on to loss causation, what Judge Morris had said earlier, Your Honor, you put your finger on it. This is the summary judgment stage. Our expert painted a series of disclosures and explained how they were linked to our client's losses. The defendants point to some other documents. They want to point to some other causes of our losses, other alleged causes. Bully for them. What they have done is shown that there's a tribal issue effect. They have not shown that there is no genuine dispute as to what caused the losses. They've only pointed to some, what they say would be countervailing, contradictory examples. But that doesn't get them out of the summary judgment arena. And finally, I would like to point out there was some talk about the analyst reports after Mr. Adelson spoke that there were 18 reports and only two of them mentioned that he was going to backstop the entire company. That's not true. Five of those reports talked about him implying that he was going to backstop the entire company. And I would submit if those other analysts were so smart and were supposed to depend upon their reports so much, I haven't heard anything. I haven't seen anything in the record that says that the other 13 were saying exactly what the defense counsel was saying, which is that Adelson was only talking about backstopping the loan covenant deal. So I think at the end of the day, Your Honors, there's a very large case, a very large record. I've lived with it for a few months. And it's ripe. By the way, I didn't concede anything. I heard something about I conceded the other part of the case. I didn't concede it. I just said let's talk about this part this morning, Your Honors. You wanted to pick the worst examples. The worst examples for them? Yes, I did. Of course. You're doing your job. I think at the end of the day, I think we've at least pointed to enough points in the record where there have been raised tribal issues of fact. And I thank Your Honors. Okay. Thank you. Thank you both sides. Pompano Beach Police Firefighters Retirement System and Alaska Electrical Pension Fund versus Las Vegas Zans submitted for decision. And that completes our argument for today. All rise.
judges: W. Fletcher, Tallman, Morris